Judge Carson is now a seasoned colleague because he's been sitting before this week. So he's ready. Second day. We have five cases for oral argument this morning. One is on the brief and we are ready to hear arguments in the first case. I see you all are ready. Stender v. Archstone Smith. Thank you, Your Honor. May it please the court, Matthew Wessler on behalf of the plaintiffs. With the court's permission, I'd like to reserve three minutes for rebuttal. You'll just have to watch your clock. Thank you. The central question in this case is whether Archstone's merger with Lehman freed it from the specific amendment requirements and bargained for protections held by the A1 unit holders that are contained in the trust. Archstone's theory, although it wasn't one shared by its lawyers during the run-up to this merger, is that none of the trust's contractual requirements or protections apply because under Maryland law, mergers can terminate minority units in a trust. But there's a problem with this argument. Whatever Maryland law might say in the abstract, it cannot override any specific restrictions contained in the trust itself. And Maryland law actually says this explicitly. Section 8501.1, which is the statutory provision that Archstone relies on, only controls the merger process, quote, unless the declaration of trust provides otherwise. So what provision in the declaration of trust are you relying on? There are several provisions, Your Honor, and I think the best way to answer that question is to take the Court through the provisions one by one. The first provision, and this is at ER 554 in the trust document, is Section 5.1a. And as the district court explained, this is the provision that generally governs Archstone's power to merge. As we explained in our brief, the contract explicitly restricts this power under 5.1a twice by specifically conditioning any merger on compliance with Section 5.3. And here I just would like to point the Court specifically to where it does that. If you look in the first section of 5.1a, which is labeled general, midway down that paragraph there's a sentence that begins, in addition to the powers now or hereafter granted a trustee. Skipping over some language that isn't relevant for purposes of this case, the clause there says that the trustee shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the trust. And again, I'm skipping over several clauses that are just surplusage, including without limitation. And then skipping down to subsection 3 of 5.1a, the document grants the trustee authority to do all sorts of things. But there and also in the paragraph above, it says that you can only do those things subject to Section 5.3. And so the question for the Court here is what does Section 5.3 require? Well, to me the key question here is whether or not the A1 unit holders, your clients, whether their powers and existence survived and whether or not at the time of the merger they still had the powers that they thought they had previously under the provision that you're relying on. I think they've, you see what I'm saying? Yes. And I think that's the argument that opposing counsels are proposing. That's right. Their argument, that's I think exactly right. Their argument, Your Honor, is that by the time the trust was actually amended, the A1s were gone. They were eliminated. And I think to answer that question, this Court needs to ask both sides. I would be happy to answer this question and I trust the other side will as well. Could you do that? Could you eliminate the A1 units putting the merger to one side? Let's just assume that there was no merger. Could you eliminate the A1 units first and then amend the trust document? I think both sides would say no, you can't do that. And the question is why couldn't you do that? The reason you couldn't do that is because 5.1a conditions any action the trustee would take on compliance with 5.3. And Arch Stoneman will say, and it's brief, it says in its view 5.3a stands for the truism that you can't contravene the trust without taking a proper amendment, just as a general matter. Right. So the question now is really can you get yourself out from underneath that restriction through a merger? And what we focus on, and I think this is where this argument sort of the rubber meets the road in this case, is subsection 3 of 5.1a, which specifically grants Arch Stoneman the authority to merge, among other things. It grants Arch Stoneman the authority to do all sorts of things under this trust. The acquisition, disposition, sale, conveyance, and it includes merger of any or all of the assets of the trust. But it does that, again, subject to 5.3. In other words, whatever right you have to merge under this provision is subject to the same restrictions that you would have if you were trying to do anything else with the A1 units outside of a merger. Conveyance. And where in district court did you make an argument in the text of any brief on summary judgment with regard to the content of 5.3a? I think we did, Your Honor, and I think it's there in multiple places. Number one, and this is at ER 481, we argued specifically that Arch Stoneman's merger here breached sections 5.3a. And you're talking about footnote 13? I am. And footnote 13, would you just – I'm sorry to cut you off, but let me ask you this question. In the two or three sentences in footnote 13, your argument was that under 5.3a, if Arch Stoneman, if the ASOP wanted to conduct a reverse merger, they would have needed to comply with 5.3a if they did a reverse merger, right? Well, under – yes, I think that's right. That's what you were about to say in that footnote. Right. And so are you saying that the argument in your footnote, not in the text, but in your footnote of footnote 13, about what Arch Stoneman would have needed to do to effectuate a reverse merger, how is that the same argument that you were just elucidating to Judge Briscoe? I don't – I didn't see an argument in your appeal brief about anything regarding a reverse merger. Well, the reverse merger here, that footnote was specifically directed to an argument that Arch Stoneman was making about how it could engineer this transaction to fit within 5.3b. And 5.3b, which is not a – it's a separate provision that governs a different kind of merger, right? A merger that, in fact, where the operating trust just is no longer around, that all the assets in the trust are gone. That's not what happened here. Right. So you're not arguing on appeal that what the ASOP did was invalid because it effectuated a reverse merger, which would have required compliance with 5.3a. That is not what you're arguing here. No, that is what we're – our argument is that the way that the operating trust merged, so a layman entity merged into the operating trust, right? That's the reverse merger. That merger was conditioned on 5.1a and 5.3a. So the way that it worked here was not a 5.3b merger. It was a merger that was governed under 5.1a, which is general authority to undertake a whole host of transactions. And that authority is specifically conditioned on 5.3a's restriction that you not do anything that would contravene a specific limitation or prohibition in the trust without following the amendment requirements of 12.3. Not to belabor this, but that part of your argument is not contained within footnote 13, right? No, I think that – There's nothing – the word contravention is not in footnote 13. The argument that there had to be compliance with the DOT, the Declaration of Trust, and that this contravened other provisions in the DOT. I won't find that if I look at footnote 13. I take your point, Your Honor. I think the argument was preserved. Section 5.3's breach was specifically presented to the district judge. It is contained – it forms the cornerstone of the breach of contract claim in this case. If you go back and you look at the operative complaint here at ER 124 and 155, you'll see the breach of contract claim. The first allegation of breach is Section 5.3a, and that's because under the way this trust was designed to work, Archstone could not take any action, whether it was amending or eliminating the units, without complying with the Article 12 amendment requirements. If it were otherwise, if that wasn't true, merger, not merger, anything, that provision would be illusory because always Archstone could then just do what it did here, eliminate the units, get rid of them, say there's no more outstanding, so we're going to amend the trust document and blue pencil out all of the key features that the A1 unit holders had. And so, yeah, I think, I mean, just on this waiver point, you know, it is designed to avoid surprise. It is designed to avoid wading in the weeds and not raising arguments, but this argument has been there from the beginning in this case, and the district court didn't look at 5.3a. All it said was the only provision I'm concerned about in 5.3 is 5.3b, but this wasn't a 5.3b transaction precisely because the operating trust wasn't terminated. It didn't go away. It wasn't merged out of existence, and so because the assets remained, the only authority that Archstone had to undertake this merger is 5.1a, specifically conditioned on all of subsection 5.3, including 5.3a. And I just want to maybe sort of reiterate that that reading of the contract, it's consistent with the way Hogan's lawyers understood how this was going to work through the run-up of this merger. They were consistently and repeatedly asked to come up with a way to get the A1s out. Lehman, as the deal is proceeding, is just saying over and over again, they're too costly. We don't want them in here. Get them out. And Hogan's lawyers are saying, we don't know how to do that under this trust document, and it isn't until Lehman just returns the merger agreement. You can see it. It's just redlined out. These A1 units, they don't exist anymore. Now, the contract, if the DOT is unambiguous, it doesn't matter what Hogan thought, right? I agree if it's unambiguous, but what we're talking about here is a question of whether even just there's ambiguity. To win today, this Court has to take a very modest step. All this Court has to say is, look, summary judgment was premature. Let's let this question go to a jury. There's a fulsome record about what the parties and their lawyers thought in the run-up to this deal. We can draw inferences about that. The jury gets to draw inferences about that. But when it comes to summary judgment and holding as a matter of law that the contract must mean what Archstone says it means, that contravenes the text, the specific provisions that govern how this was supposed to work, and the real-time record that we have in this case about how Archstone's lawyer, its own lawyers, and its past conduct understood the limitations that contained in the document. Well, you're talking about issues of material fact. And when you're looking at the language in written documents and interpreting them, that usually doesn't raise an issue of material fact. The kind of material fact you usually see in summary judgment issues are, you know, testimony questions, believability, intent, and all of that. And here we're just looking at the hard documents and saying, what does this language mean? I agree with that, Your Honor. But to the extent that there is an ambiguity about the intent of the parties, what they thought this document meant, to the extent that that ambiguity exists, then under Maryland law, but this is, you know, standard contract law, we can ask what does the extrinsic evidence say on that question. So first we have to determine that these provisions are ambiguous before we could go down that path. We think the language is clear in our favor and that the Court could reach that conclusion. But even if that weren't true, all we need to do to overcome summary judgment is to identify an ambiguity. I'd like, if the Court has no further questions, to reserve the balance of my time. Thank you. Good morning, Your Honors. My name is Jonathan Polks from the firm of Weill, Gottschall & Maggies. I'm here representing all the appellants. May it please the Court. Maybe it would be useful if I launched into a couple of the questions that were asked of my colleague. And it's with regard to the breach of contract issue, breach of the Declaration of Trust issue in particular, with regard to the argument that's being made regarding Section 5.3a of the trust. And each of Judge Bacharach, Judge Brisco, one of you asked about the waiver issue, one of you asked about the merits issue. So if I could, I'd like to take each of those in turn. Sure. And I'd like to make a point with regard to the waiver issue to start with. Merits matter. I'm going to get to the merits because no one likes the idea of a technicality. But here, waiver is much more than that. This is a situation where the waiver issue really is substantificus to the heart of the case. Judge Martinez, in his decision on page 23, very happily, as it turns out, said the following. He was reciting the issues upon which the parties agreed. That's sort of a useful device before he went into the disagreements. And here's one of the things he wrote. At the top of page 23, he wrote, Second, the only portion of Section 5.3 to which any party has pointed is even arguably applicable to the contract claims is Section 5.3b-2. So either Judge Martinez was just completely mistaken, or that was the fact. Based on all the briefing, I can tell Your Honors I'm not here as a witness, but I've been litigating this case for 11 years. And the idea that Section 5.3a has ever entered a brief in any meaningful way, it was never asked in a single deposition in this case. And I would invite my colleague, when he comes back up on rebuttal, to point to a single question or a single document that was ever asked for pertaining to Section 5.3a. What Judge Martinez said was absolutely true. And what's important is that Section 5.3b was a significant issue. So Section 5.3 in general was very focused on. No one ever pointed to that question. So as a technical matter of waiver, and then pointing to a footnote that, Your Honors, correct, Judge Bacharach makes a completely different point about reverse merger. And I should emphasize that below, and you can see this also in Judge Martinez's decision, there was an issue about whether or not the Declaration of Trust permitted a reverse merger. That issue is no longer on appeal, or is not on appeal. It was never raised. So that issue is out of the case. So to the extent Section 5.3a was ever referenced, it was in relation to an issue that is not currently on appeal. The reason I think that waiver here is such an important concept is because we have been litigating this case for 11 years. This case has been rejected, either on motion to dismiss or now most recently at summary judgment, by over a dozen judges. This is our third visit to this Court in this case or related cases. Judge Blackburn, Judge Nottingham, Judge Daniels, I could go on, all dismissed it. An arbitrator, after two years of litigation, rejected their claims. Judge Martinez breathed new life into this case and allowed it to survive a motion to dismiss by rejecting the law of the case. And that's fine. That meant that they got 50 depositions, 50. That's on top of 20 they'd taken in the arbitration. They asked for and were awarded a million pages of documents in discovery. So the normal controls and the Federal rules that say you only get 10 depositions were waived in this case. Everyone deserves their day in court. That doesn't mean you deserve 11 years in court. And so the idea of – Well, we are where we are. Well, I just – We need you to address – I appreciate your point on waiver. Do you have more to say about that? Yes. So let me – thank you, Your Honor. So let me turn now to your question, which was the substantive issue about 5.3a and whether it does, in fact, bear any relation to the question of whether or not the merger was effective. There is a fundamental distinction that Judge Martinez focused on correctly in our review and that we focus on in our brief, very, very basic bedrock concept. It's a distinction between terminating shares in a merger on the one hand and amending a declaration of trust or corporate bylaws on the other. They are different fundamental things. And that's a decision – that's a principle of law that's been recognized by the Maryland Supreme Court, by the Delaware Supreme Court, which is looked to by Maryland as extremely persuasive, by intermediate cases in Maryland, and as importantly as any of those, by statute, the Maryland REIT law, which is specifically incorporated into this declaration of trust by reference – actually say it there – says the following. It says that a REIT in Maryland can merge. And the corollary is that when it merges, shares cease to exist. That's what a merger means. It can be converted into something else. And it makes it sort of a very familiar concept. Companies can go away. And what's more is courts in Maryland and Delaware have said it's such a fundamental notion that shareholders are actually charged with knowledge of that. That's not a presumption. That's stronger than that. That means that as a matter of law, every shareholder must know that a company can merge and that their shares will cease to exist in a merger. But I think the appellant's argument here is that's all well and good, but we're relying on the declaration of trust. And the declaration of trust says you can't do what you did. And there's lots of law about that. There have been at least a half a dozen cases in Maryland and in the Second Circuit and in Delaware that we've cited in our brief where minority shareholders, whether they're preferred shareholders, whether they're people who have units similar to these in a REIT, have made exactly the same argument. It said, look, we have special voting rights and special protections. They're guaranteed to us by the corporate charter, whether it's a declaration of trust, corporate bylaws or what have you. Limited partnership agreement is another case that we've cited. And they say, so our special voting rights trump your ability to merge. And in every single one of those cases, and the appellants can't cite a single case to the contrary, the same principles that I just described have been employed. And what they are is you must read this notion that a company can merge out of existence and that your shares can cease to exist into that charter itself. The way you have to read a declaration of trust is as if it said we can merge and when we merge, your units will cease to exist. So that's something that they have to understand. That's something that's sort of baked into this declaration of trust. And most importantly now, let me get to sort of the pitch. When you read Section 5.3a, you have to read it as if what I just said is also in the contract. The contract says your shares can cease to exist if the company chooses to merge. So if you look at Section 5.3a, what it says is anything that violates this charter can't be done without an amendment. But merging and eliminating the shares doesn't violate the charter. You just don't get there. It doesn't add anything. It is not additive to the argument that they're making. So yes, if the units continued post-merger. So in other words, there could be a merger that keeps the existing trust in place, keeps the existing bylaws in place with the declaration of trust and allows the units to continue. They would still be subject and the unit holders and the trustee would still be subject to that agreement. So if there was going to be an amendment to that, of course, the anti-amendment provisions would apply. But in this case, what was done was something distinct. There was a merger that was done with no amendment. Well, what they would say, and have said, of course, is that the DOT specifically entitles the A1 unit holders to particular rights, such as distributions of earnings. And so they take the fairly modest position that there's at least some caked-in ambiguity. A reasonable person could read this to say, I, as an A1 unit holder, have a right to distribution of earnings. And what I, and I'm entitled to that under 5.3A. And to deviate from that, there has to be compliance with 12.3 and 12.4. And so I'm not getting those rights that I am entitled to, the distribution of earnings, that are elsewhere protected under the DOT in the absence, unless there's compliance with 12.3 and 12.4. And so there's at least some ambiguity about whether this is a termination merger that's authorized under 5.3B, or whether it's, it has to be done through an amendment. Why isn't that at least an ambiguity? Let me give you three answers to that, Judge Backrack. The first answer is that the units were terminated. They were converted into one of two things. The right to get cash at the same rate as the shareholders, or this tax-deferred security called Series O. They ceased to exist when the articles of merger were filed with the State Department of Assessment and Taxation in Maryland, and it's time-stamped. And it's sort of the guts of these mergers that actually matter. So at 3.58 p.m. on October 4, 2007, there were no units anymore. Well, that's their point. And I understand your point that if there was a valid termination, that once that took place, you could amend. But their argument is to say what you just said was itself a violation of 5.3A, because what you in effect did was nullify their right to earnings without going through the procedure that was required under 12.3 and 12.4. So that would require there to be some ambiguity. And let me then answer why there isn't any. Okay. This is not an argument at first impression. This has been tried before. And in Delaware in particular, the Supreme Court said in the Elliott case, which is cited in our brief, that the right to merge and convert shares and eliminate them is so fundamental, that it's so sort of understood and everyone has to understand that that's part of the deal, that anti-amendment provisions, which are there to protect, in that case it was preferred shareholders, so it's just like here, will only be interpreted to interfere with that right to eliminate shares if they specifically reference the word merger in the anti-amendment provisions. So what that means here is that unless 12.3A, excuse me, 5.3A, or the other provisions they reference, 12.3 and 12.4, say our rights kick in even in the event of a merger, unless they specifically say that, there is no ambiguity. And that's just a matter of law. And, again, this is very fundamental because otherwise, look at this case. This case was done at a 23 percent premium to the share price, and 98 percent of the shareholders voted for it. What's really happening here is you've got these unit holders who had a unique tax-preferred position saying, we have the right to hold this deal up if we're not happy with it. And the law understands that. This has been addressed many times. As a policy matter, the courts in Maryland and Delaware simply don't permit that. So what they say is that – and I should point to the Rausch v. RCA case, which we cite in our brief. It's cited in the polling case, which is the appellate court decision in Maryland, sort of favorably it's adopted. What the court said there is companies have the right to structure mergers in a way that benefit the corporation and it maximizes value. And you're not going to interfere with that right on behalf of minority unit holders unless there is crystal clear reference in those anti-amendment provisions that says, this includes all your merger stuff. And it doesn't here. So there's no ambiguity, so you never get there. So really they're not given much of anything in 5.3a. 5.3a just says something that makes perfect sense. If you're doing something that would contravene any provision of this Declaration of Trust, you've got to amend it. I get that. I'm not going to argue with that concept. Right. But, as I say, the right to merge and eliminate shares is part of that Declaration of Trust. So there is no ‑‑ nothing is being contravened. Nothing in the Declaration of Trust is violated. And the merger ‑‑ The merger is not an amendment. The merger is not an amendment. They're just different things. To put it in a nutshell. And sort of just to, again, to sort of ‑‑ concepts aren't hard to deal with, I don't think. It's one thing to say if, you know, we form a book club and you're a member of my book club, that as long as the club is in existence, we're going to sort of agree to certain things. But that doesn't mean I'm saying I'm not going to ever close the club. And the protection that you get, I won't emphasize this point. I'm almost done, so it's a good way for me to end. The protection is provided in the Declaration of Trust in Section 5.3b, which permits mergers, and Section 9.2b, which is the provision, parallel provision, that permits mergers for the operating trust, the underlying unit. What they both say is there only needs to be one vote, and that's a vote of all the shareholders together, which means, in effect, the minority doesn't get to control the outcome. But the but, provided that the consideration paid to the minority unit holders is the same. That's their protection. They walk into this knowing the deal. And, again, it goes to being charged with knowledge. The deal is you don't get control. This company can merge out of existence any time, but your protection is you're not going to get harmed because you'll be paid whatever the shareholders get paid. That's what happened here. There's no dispute about it. Unless there are any questions, I'll waive my last minute. Thank you. Thank you, Your Honors. Just a few quick points in response, Your Honors. I want to just reinforce a point that my colleague just made, which is you asked Judge Bacharach, well, why isn't there just any ambiguity here? And his response was to say, well, look, under Maryland law, the only way you can overcome this background rule is to identify something in the contract or the trust that specifically requires that the entities comply with a provision that doesn't allow it. He said if there's nothing in the trust that specifically references a merger, then you're out. You don't get it. And I would agree with that. And I would point the Court to 5.1a, which specifically references mergers and says that that authority is conditioned on 5.3. That is the language that gets us out of the background rule that you can do whatever you want in a merger and yokes the trustee in this case to complying with the specific requirement that prohibits contravention of the trust without amendment. That language under Elliott Associates, under Kinder Morgan, which is a case that the parties have fought about the meaning of, is a sufficient enough carve-out to the general rule that says, look, trustee, you can do all sorts of things. You can merge, you can convey, you can dispose, whatever. But if you do them, you do it subject to 5.3. And what you haven't heard from my colleague, and I think this is the key point, is no effort to explain why 5.3 doesn't say what we say it says. It's clear. It's categorical. It allows for no ‑‑ What they're saying, I think, is that, well, it requires compliance with 5.3b, which requires compliance with 9.2b. And as long as those three requirements under 9.2b are satisfied, the termination merger is compromised under 5.1a. I'm glad you raised that point. Just to be as clear as I can about this, this is not a 5.3b transaction. And you can go right to the language, and I don't have it with me, but it's three pages past 5.1a. It says a 5.3b transaction is only a transaction in which the operating trust's assets are sold or transferred. And that ‑‑ there's no dispute that that didn't happen here. I see my time is done. Thank you, Your Honors. Thank you. Thank you both for your arguments this morning. The case is submitted.